# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs September 7, 2011

## STATE OF TENNESSEE v. RONALD DUCKETT

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-04577     John T. Fowlkes, Jr., Judge**

---

**No. W2010-02158-CCA-R3-CD - Filed April 30, 2012**

---

Defendant, Ronald Duckett, was indicted by the Shelby County Grand Jury for two counts of first degree premeditated murder. Following a jury trial, Defendant was convicted as charged and sentenced by the trial court to serve two concurrent life sentences. In this direct appeal, Defendant asserts that: 1) the trial court erred in refusing to instruct the jury as to voluntary intoxication; 2) the evidence at trial was insufficient to support his convictions; and 3) the trial court erred by reconvening the jury to alter its verdict after the jury had been discharged. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Robert Wilson Jones, District Public Defender; Harry E. Sayle, III, Assistant Public Defender; and Timothy J. Albers, Assistant Public Defender, Memphis, Tennessee, for the appellant, Ronald Duckett.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; Theresa McCusker, Assistant District Attorney General; and Kirby May, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

*Facts*

On June 6, 2009, Willie Hooper was living in a "rooming house" at 309 North Manassas with his son, Willie Hooper, Jr., and Darlene Anderson. Mr. Hooper testified that "[his] cousin [Mr. Sample] and a friend [Tommy Pryor] of [his] got killed there that night." He testified that he, "T.C." (Mr. Sample), a female named Jackie, and Tammara Wright were "back there, you know, having fun or drinking, smoking weed and some of them were snorting powder." Ms. Anderson told Mr. Hooper "to come and get this guy out of her room, he was tearing it up." When Mr. Hooper entered Darlene's room, he saw Defendant sitting on her bed "with a straight shooter." Mr. Hooper asked him to leave, but Defendant did not respond. Mr. Hooper testified that Defendant was looking at [him] biting on his bottom lip" and he "looked like he was out of it." Mr. Hooper went to get his cousin to help him. When they entered Darlene's room again, Defendant backed away towards the door, and Mr. Hooper pushed him out of the door. Mr. Hooper testified that he then "got drunk and went to [his] room and went to sleep." He woke up to the sound of two gunshots. He then heard Melissa "beating on [his] door." He walked around the house and saw Tommy Pryor lying on the floor "looking up at the ceiling with his eyes open [and] a puddle of blood [on] his chest." He went outside and saw Jackie and Tammara Wright outside crying. He walked around to the side of the house and saw Thomas Sample "up against the wall." He then called 911.

Mr. Hooper testified that he never saw Defendant with a gun, and he did not see him inside the house again after he told him to leave. After the incident, Mr. Hooper recognized Defendant in a photographic lineup as the person he told to leave the house. Mr. Hooper testified that there was another exit out of the house in the kitchen but that it had a deadbolt lock on it, and he was the only person who had the key to that door.

Trevis Sprawling was visiting Mr. Hooper at the rooming house on June 6, 2009. He testified that he, Tammara Wright, Willie Hooper, Jackie Pryor, Thomas Sample, and Tommy Pryor were "indulging in a little drug activity, just drinking, smoking [marijuana], stuff like that." Mr. Hooper asked him to assist him in "escort[ing] a guy out of the room" who Mr. Hooper said was "tearing up the property." Mr. Sprawling testified that when he went to the room where Defendant was, Defendant was loud and cursing and "having a disagreement" with Mr. Hooper. Defendant was "standing in the doorway[,] acting like he didn't want to leave." Mr. Sprawling stepped between Defendant and Mr. Hooper, and Defendant backed out of the door onto the porch. Mr. Sprawling knew Defendant from having seen him "[i]n another neighborhood." Mr. Sprawling testified that he turned to walk back inside the house and he heard Defendant say, "if those females didn't give him what they owed him[,] he will be back to blow up the house." Mr. Sprawling did not see any weapons in Defendant's possession. He went inside and "went back to doing what we was doing, partying."

Mr. Sprawling testified that an hour later, he heard shooting. The door to the room they were in "flew open," and he saw an arm holding a gun. Mr. Sprawling testified that he "rushed the [Defendant]" and was "wrestling with him for [his] life." Mr. Sprawling "ran and grabbed his arm and tussled with him." Mr. Sprawling pushed Defendant down and ran outside. As Mr. Sprawling was "exiting the porch" he heard two more gunshots. He saw his cousin "Thomas [Sample] hanging out the window." He ran over to help him. Mr. Sprawling was helping him walk towards the front of the house, and Mr. Sample fell on the ground. Mr. Sprawling went inside the house to find his girlfriend Jackie, and he saw Tommy Pryor lying on the floor. He passed Mr. Hooper, who was leaving the house, "looking for our cousin." On the day after the shooting, Mr. Sprawling identified Defendant as the shooter in a photographic lineup. On cross-examination, Mr. Sprawling testified that in a statement to police, he said that "[Defendant] couldn't see [him] and [he] couldn't see [Defendant]."

Jacqueline Pryor testified that she arrived at the rooming house at approximately 10:00 p.m. She testified that she was married to Tommy Pryor at the time of the incident. They had been married for "about twenty-one, twenty-two" years, but they were separated and she was there with Trevis Sprawling, her then boyfriend. She testified that they were "drinking and playing cards and smoking marijuana" in the back room. She heard noise coming from the front of the house, and Mr. Pryor and Mr. Sprawling went with Mr. Hooper to the front room. Ms. Pryor stayed in the back room. An hour later, Ms. Pryor heard "something sound like some firecrackers." She "got out the chair and [she] hit the floor." She heard everyone screaming. Ms. Pryor testified that she heard four or five gunshots total. She testified that she saw the gunman and identified him as Defendant. She heard "three at first," and she got down on the floor. Defendant put the gun to her head and said, "move, baby, move," and she "jumped in the closet" and heard more gunshots. When she got out of the closet, she saw Mr. Pryor "on the floor dead."

Alan Pendleton, of the Memphis Police Department, was on patrol on the night of the incident. He and Officer Garner responded to a shooting call at 309 North Manassas. When they arrived, they found one victim, who appeared to have been shot in the stomach, outside of the house. They found another victim in the back bedroom of the house. Officer Pendleton and other officers isolated potential witnesses in squad cars until homicide detectives arrived. The officers did not locate a suspect at that time.

Demar Wells, a crime scene investigator with the Memphis Police Department, took photographs at the scene and collected evidence. He collected cigarette butts on a tray in the front room of the house that investigators believed may have been left by the suspect. Jessica Marques, of the Tennessee Bureau of Investigation, compared Defendant's DNA samples

with DNA collected from the cigarette butts found at the crime scene and concluded that Defendant's DNA was left on the cigarette butts.

Tammara Wright testified that she was "sitting around talking" and "smoking weed" in the back bedroom on the night of the shooting. She testified that they were "sitting back there having a good time [and] someone just had their arm in the door and it was like pow." She testified that earlier in the evening, Willie Hooper and Tommy Pryor went with Darlene Anderson to the front room to escort Defendant out of the house. Ms. Wright testified that she and Trevis Sprawling followed them to the front room. She saw Tommy and Trevis talking to Defendant on the porch. Tommy and Trevis returned to the back room, and "an hour or so later that's when someone stuck their arm . . . [she] just [saw] an arm and a pistol in his hand." Ms. Wright testified that she heard gunshots and saw Tommy Pryor on the floor. She hid beside a dresser. When the gunshots stopped, she stood up and saw Jackie and Thomas Sample come out of the closet. The gunman appeared in the doorway again and put the gun to Jackie's head and told her to get down. Ms. Wright testified that she "looked him dead in his face" and identified the shooter as Defendant. He then fired two more shots, and Ms. Wright hid behind the dresser again. When it was quiet again, she pushed the air conditioner out of the window, and she and Thomas Sample climbed through the window. Trevis Sprawling helped get Thomas Sample out of the house through the window.

On cross-examination, Ms. Wright testified that she called 911 after she saw that Mr. Sample had been shot. She went inside the house to check on Mr. Pryor, and he did not respond. She testified that she left the scene before police arrived because she "was scared because [she] had a warrant out for [her] arrest." Ms. Wright testified that she was grazed by a bullet. She later gave a statement to police, and she identified Defendant as the shooter in a photographic lineup.

Darlene Anderson testified that she rented a room at the rooming house located at 309 North Manassas. She testified that she "used to get high" and "have sex" with Defendant. Defendant arrived at the house at approximately 7:00 or 8:00 p.m. on the night of the incident. She testified that Defendant, a woman named Melissa, and she were "smoking dope" in her room, and Defendant refused to leave. She found Mr. Hooper in another room and asked him to escort Defendant out of her room. Defendant left the house after she and Mr. Hooper "practically had pushed him out the door." After Defendant left, she and Melissa went back to her room, and a man named Zeke arrived. Ms. Anderson heard a knock on the door, and it was Defendant. She testified that Defendant "came through the door and he had a gun." Defendant said, "they say a coward is a killer and I'm a coward," and he told Ms. Anderson that he loved her. She testified that Defendant pulled the gun out of his pants and she held his hand. Defendant hit her in the head with the gun. She heard gunshots and ran out of the house and hid in the grass. Ms. Anderson testified that Defendant did not have a

-4-

gun when he was at the house earlier in the evening. Ms. Anderson identified Defendant in a photographic lineup. She described the gun as a long, black and brown revolver. She did not see Defendant shoot anyone.

Dr. Karen Chancellor, the Shelby County chief medical examiner, performed the victims' autopsies. Victim Thomas Sample died from a gunshot wound to his back. Mr. Sample had cocaine in his system at the time of his death. Victim Tommy Pryor died of a gunshot wound to his chest. Mr. Pryor had consumed alcohol prior to his death.

*Analysis*

I.      Jury Instructions

Defendant asserts that the trial court erred in failing to instruct the jury that voluntary intoxication may, under certain circumstances, negate the specific intent required for a conviction for first degree murder.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see also* Tenn. R. Crim. P. 30. The defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge. *State v. Hatcher*, 310 S.W.3d 788, 814-816 (Tenn. 2010) (citations omitted).

At the conclusion of the State's proof in this case, defense counsel requested that the trial court instruct the jury on intoxication. The trial court denied Defendant's request finding that "at this point in the trial intoxication really hasn't been shown."

Voluntary intoxication is not in itself a defense to prosecution, but it "is admissible in evidence, if it is relevant to negate a culpable mental state." Tenn. Code Ann. § 39–11–503(a). In *Harrell v. State*, 593 S.W.2d 664 (Tenn. Crim. App. 1979), this Court set forth the rule as to when the proof requires a voluntary intoxication instruction:

> Proof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle the accused to jury instructions . . .; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent . . . . The determinative question is not whether the accused was intoxicated, but what was his mental capacity.

*Id*. at 672 (citations omitted).

The burden is on the defendant to produce sufficient proof of intoxication to warrant a jury instruction. *Hicks v. State*, 533 S.W.2d 330, 331–32 (Tenn. Crim. App. 1975) (holding that the "mere fact that there was some evidence that the defendant had been drinking, without more, is not sufficient to raise the issue of voluntary intoxication"). However, when the evidence establishes that a defendant was "highly intoxicated" a jury instruction will be warranted even without a special request. *Brown v. State*, 553 S.W.2d 94, 95–96 (Tenn. Crim. App. 1977).

We agree with the trial court that there was no evidence presented demonstrating that Defendant was so intoxicated he could not form the requisite mental state to commit a premeditated first degree murder. The evidence at trial established that Defendant had consumed alcohol and smoked marijuana and cocaine prior to the shootings, but there was no evidence presented regarding how intoxicated Defendant was at the time of the shootings approximately one hour later. We conclude that the evidence fails to demonstrate that Defendant's intoxication was such that it deprived him of the mental capacity to form the culpable mental state required for premeditated murder. Defendant is not entitled to relief on this issue.

II. Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his convictions for first degree premeditated murder. In his brief, Defendant argues that there was "insufficient evidence of premeditation and there is evidence that Defendant was intoxicated so as to negate the element of intent." Defendant further asserts that "[t]here was abundant evidence that the witnesses were impaired by drink and drugs" and seems to argue that the evidence of his identity as the shooter was insufficient due to the witnesses' intoxication. We have already concluded that the evidence of Defendant's intoxication was minimal.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190–92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754

S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (Tenn. 1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982).

First degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39–13–202(a)(1) (2010). "Premeditation" is defined in our criminal code as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39–13–202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent

to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005).

Viewed in the light most favorable to the State, the evidence established that Defendant was confronted by residents of the rooming house and told to leave the premises. He was unarmed when he left the house and returned an hour later armed with a gun. He fired multiple shots at close range upon the unarmed victims, killing Tommy Pryor and Thomas Sample. Mr. Pryor was shot in the chest, and Mr. Sample was shot in the back as he was trying to flee the house. Mr. Sprawling testified that Defendant stated, before leaving the house the first time, "if those females didn't give him what they owed him[,] he [would] be back to blow up the house." When he returned, he told Darlene Anderson, "they say a coward is a killer and I'm a coward." Several witnesses identified Defendant as the shooter, and the jury accredited those witnesses' testimony. This evidence was sufficient to support a finding of premeditation. We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions for first degree premeditated murder. Defendant is not entitled to relief on this issue.

III.    Jury Recall

Defendant next contends that the trial court erred when it reconvened the jury to correct its verdict after the jury had been discharged because there was "the possibility of outside contact during the 26 minutes between original discharge . . . and reassembly[.]" The State responds that there was no possibility for outside contacts because the jury "was not separated from the presence and control of the trial court" before it reconvened to correct its verdict.

After the trial court read the jury's verdict, in which it found Defendant guilty of first degree premeditated murder as charged in count one of the indictment and "guilty of murder in the second degree as charged in the – it says in the first count of the indictment. Okay, so it should be in the second count of the indictment. Alright I will double check that with you, [the jury foreperson]." The trial court then polled each juror and all jurors affirmed the verdict. The trial court accepted the jury's verdict, thanked them for their time and asked the jury "to step into the jury room just a couple of minutes. I [would] like to come back and just thank you personally." The transcript reflects that the jury retired to the jury room at 2:05 p.m. The trial court then sentenced Defendant to life imprisonment for his conviction in

count one and set a hearing date as to count two. The court adjourned but then returned and addressed counsel outside the presence of the jury as follows:

> I had called everyone back because a problem has developed with the second count of the indictment. As you all know, I read it and there's a scratch out here in the verdict that was written up by the foreperson, [    ]. And I read what I thought she was trying to say, is that it was murder in the second degree.

> I was speaking with the jurors in the jury room and thanking them for their jury service and they indicated, the foreperson indicated to me that she wanted to make sure I understood and in fact their intent was murder in the first degree. I just wanted to – and then I called everyone back in because I want to make sure I put everything clearly on the record what has occurred. The jurors are still here. I did speak with them unofficially and as I said in thanking them. But I think that in some way we're going to have to indicate on the jacket here exactly what their verdict is. It's here, I'll pass what is written so that everyone can see exactly the terminology that was used.

> . . . .

> Before I'm going to read into the record exactly what it is. And it's, ["]we, the Jury, find the defendant guilty of murder in the["] and that's where the scratch out is, looks like second degree but it's a scratch out with an arrow pointing down to the bottom of where the handwritten material is and the word ["]second["] is there. So it's ["]second degree as charged in the first count of the indictment.["] Okay, it does say ["]as charged.["] But it also says ["]in the first count of the indictment.["] Of course, on the left hand side we have the verdict for the first count of the indictment which was murder in the first degree.

> My intention is the jurors are still here, bring them in, give them some instructions about going back and writing again their[,] or deliberating further if they need to, but writing again their verdict as to the second count of the indictment so that there is no misunderstanding. I'll hear from both sides with regard to that procedure that I'm intending to follow through with.

The State and the defense consented to the trial court's plan. Defense counsel stated, "We're in agreement too, judge. Just they need to clear up what it all means." The jury then returned to open court, and the trial court instructed the jury to "deliberate further, if you need to, but write up again the verdict for count two of the indictment."

At 2:33 p.m., the jury retired from open court and returned seven minutes later, at 2:40 p.m. The trial court then read the verdict: "We, the Jury, find the defendant guilty of murder in the first degree as charged in the second count of the indictment." The trial court polled the jury, and all jurors answered affirmatively. The trial court accepted the jury's verdict and excused the jury. Defense counsel then moved the trial court for a mistrial on the grounds that the jury had been discharged, and the verdict in count two was ambiguous, which "cast an ambiguity even as to the first count." The trial court denied Defendant's motion for mistrial and sentenced Defendant to life imprisonment for his conviction in count two.

In denying Defendant's motion for new trial, the trial court stated:

> All I can say for the record, again, is what happened when I went into the jury room. They were still in the jury room and the public is not allowed back there.
>
> The twelve jurors were there. The court officer accompanied me when we stepped into the jury room.
>
> When I entered the room and began to thank them for their jury service, the foreperson of the jury indicated that their true intention was murder in the first degree, and then, other jurors indicated that that was correct.
>
> There was an indication that the verdict in – for that second count, if you will remember, there was some confusion when we were in the courtroom, and ultimately, I read what I thought their intention was, that murder in the second degree was the decision of the jury.
>
> I even read it to them and asked them individually if it was their verdict. I made that correct. It does say first count and I said, you meant the second count? The transcript of my exchange with them will show what was actually said.
>
> But when I entered the jury room to thank them for their service, that's when the foreperson indicated that their verdict for the second count was,

in fact, murder in the first degree, and the arrow indicating second was intended for the count, and not for the offense.

It was obvious to me that an error had occurred and that there was a miscommunication of their true intent.

That's when I immediately exited from the jury room along with the court officer and contacted the parties and explained what had happened.

At that time, they were permitted to rewrite the verdict for the second count of the indictment, which is shown on the verdict page of the jacket as – which has now been marked as Exhibit Number One for the Court of Appeals.

In light of that, there was no intermingling of the jury with the public. There was not even a potential of that in light of the fact they were still in the jury room. There was no outside contact or anything along those lines.

And the jury was later able to correct the verdict.

Once a jury is discharged, it may not reconvene to correct or amend the initial verdict. *State v. Green*, 995 S.W.2d 591, 612 (Tenn. Crim. App. 1998). Our supreme court long ago held in *Clark v. State*, 170 Tenn. 494, 97 S.W.2d 644 (Tenn. 1936), that a trial court may not reassemble a jury for any purpose once the jury has been discharged and passed from control of the trial court. In *Clark*, the trial court discharged the jury under the mistaken belief that it was irreconcilably deadlocked as to the guilt of four co-defendants. In truth, the jury had voted "not guilty" as to the defendant Clark. *Id*. at 645. Clark, having learned of these circumstances through discussions with several of the discharged jurors, moved to reassemble the jury for the purpose of accepting an erroneously withheld not guilty verdict. *Id*. The trial court denied the motion, emphasizing the danger that arises when a jury is reconvened:

> An invariably followed rule, supported not only by precedent, but the soundest reason, grounded on universal knowledge of human nature, is the rule that after the discharge of a jury in a felony case and the separation of the jurors to such a degree that outside contacts may have been even momentarily had, the members of that jury may not be reconvened for the taking of any action whatever involving the fate of the accused.

*Id*. at 646.

-11-

In this case, however, it is clear from the record that the jury did not at any point between being discharged and reconvened leave the jury room.  Thus, the jury remained in the control of the trial court, without any outside contact, during the brief period of time that elapsed between being the reading of the first verdict and the reading of the corrected verdict. We conclude, therefore, that the trial court did not err in reconvening the jury.  Defendant is not entitled to relief on this issue.

## CONCLUSION

After a careful review of the record, we affirm the judgments of the trial court.

_____

THOMAS T. WOODALL, JUDGE